UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
JEFFREY SMITH,                                       :     Civil Case No.:
                Plaintiff,           :
     v.                                              :
                                        :     **COMPLAINT**
META PLATFORMS, INC d/b/a META,       :
                                        :
                Defendant.          :     **Jury Trial Demanded**
------------------------------------------------------------- X

Plaintiff Jeffrey Smith ("Smith" or "Plaintiff") hereby alleges, by and through his undersigned counsel, Wigdor LLP, as and for his Complaint against Defendant Meta Platforms, Inc. d/b/a Meta ("Meta" or the "Company") as follows:

**PRELIMINARY STATEMENT**

1. Smith is an accomplished engineer who joined Meta in 2018 with over a decade of engineering experience, having held technical, management and founder positions at a variety of startups.

2. He has been praised by colleagues for his "clear guidance," "investment [in] managing people," "knowledge, ability, fast learning, and willingness to dig into issues." He has also been celebrated for his concrete technical skills, acumen as a "great communicator," and capacity to be "organized, reliable, pro-active, and on top of things." One direct report described Smith as the "the most thoughtful manager I have ever had."

3. Predictably, Smith has consistently received accolades and bonuses that showed that he was an exemplary employee, and as recently as 2022, Smith was in conversations regarding a promotion because of his outstanding performance at Meta.

4. Smith's upward trajectory stopped suddenly when, beginning in the summer of 2023, he began to raise concerns about misogyny and the treatment of women in the workplace

at Meta. For instance, Smith protested that a qualified female employee was inexplicably stripped of responsibilities, a male supervisor was hyper-critical of a female direct report, certain male managers exhibited bias towards women they oversaw and that Meta exhibited systematic preferential treatment towards men in promotions and ratings, while failing to provide career development support to women. He even challenged the members of the male leadership team to state what efforts they were making to improve diversity.

5. The more Smith protested, the worse things got. Suddenly, Smith received unwarranted performance criticism, a false negative performance review and significantly diminished compensation. By spring 2024, Smith's manager told Smith that he should look for another job within Meta and that Smith should resign.

6. Defendant's actions violated the anti-retaliation and anti-interference provisions of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

7. Concurrent with this complaint, Plaintiff will file a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of 42 U.S.C. § 2000e *et seq*., Title VII of the Civil Rights Act of 1964 ("Title VII").

8. Plaintiff will seek to amend his Complaint to add Title VII claims after exhausting his administrative remedies.

9. Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

10. All other prerequisites to the filing of this lawsuit have been met.

**JURISDICTION AND VENUE**

11. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity and the amount in controversy exceeds $75,000.

12. Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

13. Plaintiff Jeffrey Smith is domiciled in New York.

14. At all times, Smith was an "employee" of Meta under all relevant statutes.

15. Defendant Meta is a corporation registered in Delaware and headquartered in California.

**FACTUAL ALLEGATIONS**

**I.  BACKGROUND**

16. Smith was hired by Meta (then Facebook) in 2018.

17. He brought with him over a decade of engineering experience, having held technical, management and founder positions at a variety of startups.

18. At Meta, Smith has held management positions in AI Platform/PyTorch, FAIR and Reality Labs, managing multiple teams of over 50 people.

19. Smith has been a high performer at Meta for years.  He has received the highest possible performance rating, "Exceeds Expectations."

20. Furthermore, Smith's Pulse[1] numbers have been above the average in his reporting chain since he joined Meta, and the year 2022 was no exception. His Pulse feedback indicated that he was an excellent manager in 2022, superior to most of his peers.

21. Smith has been praised by fellow managers and coworkers for his "clear guidance," "investment [in] managing people," "knowledge, ability, fast learning, and willingness to dig into issues." He has been consistently described as a thoughtful leader who mentors and empowers his direct reports, taking care to teach and advocate for the people he manages.

22. Smith has also been praised for his concrete technical skills, his acumen as a "great communicator" and his capacity to be "organized, reliable, pro-active, and on top of things." One direct report described Smith as the "the most thoughtful manager I have ever had."

23. Smith received Additional Equity Grants[2] every year between 2019 and 2022. In 2022, after Smith was awarded his fourth consecutive Additional Equity Grant, TR Reardon ("Reardon"), a Meta Vice President, informed Smith that he wished to "talk to [Smith] about [a] path to D1," or promotion to a higher managerial position.

II. **SMITH RAISES A NUMBER OF SERIOUS COMPLAINTS**

24. Smith's upward trajectory changed abruptly when he began to raise concerns about misogyny and the treatment of women at Meta.

---

[1] In addition to traditional performance reviews, Facebook also evaluates managers based on feedback provided by that manager's reports. This feedback is called a "Pulse" report, and the Pulse offers a direct performance comparison between managers.
[2] "Additional Equity Grants" are awards of a significant number of shares in Meta which are given yearly in recognition of truly exceptional performance. They are given to a very limited number of Meta employees and may be valued in the millions of dollars.

25. In the summer of 2023, Meta's AR Inputs & Interactions Research & Development Team underwent a reorganization. Smith was placed under a new direct manager, Senior Director of Engineering Sacha Arnaud ("Arnaud").

26. In May and June of 2023, Smith complained to Arnaud about the responsibilities given to women when Smith's department was reorganized.

27. Smith managed an exceedingly capable female Meta employee, Employee A,[3] who had been the recipient of an Additional Equity Grant and earned a Greatly Exceeds Expectation rating on her most recent annual review.

28. However, when the department was reorganized, Employee A's role was inexplicably downsized. Smith and Nathan Danielson ("Danielson") were allocated responsibilities instead.

29. Danielson was a particularly poor fit for his role. He had only five years of experience (compared to Employee A's 18) and no experience as a manager-of-managers (in contrast with Employee A).

30. Smith also voiced concerns about another female researcher at Meta, Employee B.

31. Employee B had formerly been a high-performing employee. Under the management of Research Scientist Ran Rubin ("Rubin"), however, she began to struggle.

32. Smith noted that Rubin tended to evaluate Employee B's work more critically than men's work. Rubin also went through long periods in which he neglected to evaluate Employee B's work entirely.

---

[3] The names of employees below the managerial level have been anonymized.

33. Employee B shared her complaints about Rubin's sexist management and its negative impact on her wellbeing and work with Smith.  Although Employee B was placed under a new manager because of the summer 2023 reorganization, Employee B went on leave for mental health reasons and ultimately resigned from Meta.

34. Disturbed, Smith complained to Arnaud, Director of Research Patrick Kaifosh ("Kaifosh"), his skip-level supervisor, and VP Reardon.

35. Beginning in the summer of 2023, Smith began to field complaints from the women on his team and forward them to management.  Several women on Smith's team held meetings and relayed their concerns to Smith about managers like Rubin, Danielson and Evgeniy Gabrilovich.

36. The women informed Smith that these managers exhibited a pattern of neglectful management, overly critical feedback and bias against the women they oversaw.  The women also relayed complaints about systematic preferential treatment towards men in promotions and ratings, and a lack of career development support.

37. Smith relayed these concerns to Kaifosh, Arnaud and HR.

38. While Smith attempted to arrange better support for the women on his team himself to address their concerns, to Smith's knowledge HR and management took no action.

39. On June 30, 2023, Smith formally expressed his concerns about Rubin in the Performance Process.

40. Smith had received complaints from Employee A about Rubin's poor treatment of women.  Other women on Smith's team had expressed concerns about Rubin to Employee A, who relayed their concerns to Smith.

41. Smith then put these complaints into writing. Smith noted that three specific women—Employees A, C and D—had experienced this poor management because of their sex.

42. During the summer reorganization of Meta's AR Inputs & Interactions Research & Development Team, Rubin had advocated for white men to have supervision over the work of these women.

43. Rubin denigrated Employee A's competence as a manager, Employee C's ability to lead a team in an area of responsibility she had been running for approximately six years and Employee D's ability to manage other employees generally.

44. Rubin's comments about each of these women was not based on any evidence, and all had significant experience and no complaints against them.

45. Smith also expressed concerns that Employee B had been given a negative mid-year evaluation after Rubin had failed to give her explicit guidance or feedback on her work.

46. In July of 2023, Smith began to field more complaints from female direct reports.

47. These complaints were not only related to misogynistic management.

48. Women who Smith managed also complained to him about the small number of women hired into Meta's research department, the lack of promotions for women and poor career development support for female researchers.

49. Smith agreed about the sexist treatment and conveyed these concerns to Arnaud, HR partner Ashley Garver and Ming Hua, a Vice President.

50. To Smith's knowledge, no action was ever taken regarding his complaints about Mr. Rubin or the culture at Meta.

### III. SMITH BEGINS TO EXPERIENCE RETALIATION, BUT CONTINUES TO VOICE HIS CONCERNS

51. In August 2023, the situation came to a head.

52. Smith gave Employee A responsibilities more commensurate with her experience and abilities.

53. Smith was punished almost immediately.

54. Meta failed to present Smith with his planned August formal review, which was highly unusual. Instead, for the first time in Smith's career at Meta, one of his supervisors, Arnaud, was critical of Smith's work in an informal review.

55. Upon information and belief, Arnaud withheld Smith's formal review, which would have included anonymous feedback from peers and individuals Smith managed, to present him with a negative review.

56. Smith felt intimidated. He became worried that he could not share his honest feedback with his peers or with Meta management without endangering his role at the Company. As a result, Smith went some time without advocating for the women on his team for fear of retaliation.

57. In October 2023, Smith decided that he could not stay silent any longer about this treatment that he believed violated the law and discussed his concerns about the barriers to women being promoted and advancing within Meta with Dasha Perez, an HR professional at the Company.

58. He discussed his specific concerns about Rubin and Employee B with Courtney Concannon, a Partner in Employee Relations.

59. He again voiced concerns to Arnaud about Rubin's tendency to exclude women, and flagged examples of situations in which Rubin and Emmanuel Strauss, the Director of Engineering, had undermined Employee A's decision-making authority by excluding her from meetings, decision documents and design architectures.

60. It was in this month that Smith also received a positive Pulse report, indicating that his performance as a manager was excellent.

61. Even as Meta's management was bent on retaliating against Smith for his concerns about the place of women in the workplace, Smith's direct reports continued to praise his performance.

62. In November 2023, Employee B resigned. Smith again complained to Arnaud, voicing his concerns that the actions of Rubin and other managers were driving women away from Meta by treating them unequally.

63. Smith also continued to discuss the lack of women, and diversity in general, in the leadership of the research department with Arnaud.

64. On December 14, 2023, Arnaud hosted a Q&A that featured his EMG Engineering & Research Leadership team.

65. The 10-member panel, including Smith, was entirely male.

66. In preparation for the Q&A, Smith insisted that the leadership team address the question of diversity. At the Q&A, Arnaud gave an evasive answer regarding the lack of women in leadership roles on the team. Smith, on the other hand, directly stated that everyone on the leadership team should be able to concretely state what efforts they were making to improve diversity at Meta.

67. Merely weeks later, Arnaud warned Smith that he would be receiving a negative annual performance review.

68. On January 24, 2024, Smith again formally expressed his concerns about Employee A and Employee B in performance review feedback to Rubin.

69. Smith also made complaints regarding Danielson's behavior as a manager, and explicitly noted a lack of career development for women and the failure to consider women when hiring, particularly for leadership roles.

70. On February 2, 2024, Smith made yet another complaint in writing.

71. There was an opening for a Research Science Manager on Danielson's team.

72. Danielson intended to fill the role with a junior white man.

73. Smith expressed his concerns about Danielson's choice in an email to Arnaud, Perez and Danielson.

74. Smith noted that the two most qualified people for the role, Employee D and Employee E, were both women and were not being considered. Smith further suggested that a formal interview process might ameliorate bias in filling such roles in the future and ensure that people from underrepresented groups were considered for those roles.

75. Arnaud responded by lashing out at Smith, questioning whether Smith's response was "productive."

76. Shortly thereafter, on April 9, 2024, Arnaud warned Smith, for the first time, that taking an already-planned and previously-approved trip would cause Smith to miss his performance expectations.

77. On that same day, Smith met with Concannon to discuss misogyny at Meta. Smith noted that two of his male direct reports, Employee F and Employee G, had behaved disrespectfully towards women on his team.

78. Employee F yelled at and insulted Smith, as well, at a meeting concerning his performance review.

79. Employee F now works under Danielson and, upon information and belief, is taking on responsibilities and direct reports as a manager.

### IV. SMITH LOSES SHARES, HAS HIS BONUS REDUCED AND IS ASKED TO RESIGN

80. On March 14, 2024, Arnaud gave Smith a "Meets Most Expectations" rating on Smith's annual review.

81. That annual review was highly unusual. It did not contain any peer or direct report feedback, as has been the case in every prior review that Smith has received. Instead, the feedback came exclusively from Arnaud.

82. Again, upon information and belief, this was because positive feedback was withheld to ensure that Smith received a negative review.

83. The poor review resulted in a lower bonus payout for Smith, lower equity refreshers[4] and meant that Smith was excluded from consideration for an Additional Equity Grant.

84. On March 14, 2024, Arnaud told Smith to search for a new job internally. Arnaud, however, knew that the false subpar performance rating made Smith ineligible for an internal transfer.

85. On April 4, 2024, Arnaud again met with Smith. At that meeting, Arnaud made clear that he no longer wanted Smith to remain at Meta, stating that Smith should consider resigning his role.

---

[4] Compensation at Meta includes "equity refreshers," or additional grants of equity that are contingent upon hitting performance goals.

11

## FIRST CAUSE OF ACTION
### (Retaliation Under the NYSHRL)

86.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

87.     The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

88.     By the conduct described above, in response to Plaintiff's protected complaints, Defendant subjected Plaintiff to retaliation, including but not limited to poor reviews, a diminished bonus, reduced compensation and being asked to resign.

89.     As a result of Defendant's conduct, Plaintiff has suffered economic and noneconomic injury for which he is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Retaliation Under the NYCHRL)

90.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

91.     The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter."

92. By the conduct described above, in response to Plaintiff's protected complaints, Defendant subjected Plaintiff to retaliation, including but not limited to poor reviews, a diminished bonus, reduced compensation and being asked to resign.

93. As a result of Defendant's conduct, Plaintiff has suffered economic and noneconomic injury for which he is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### (Interference Under the NYCHRL)

94. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

95. The NYCHRL provides that it is unlawful to "coerce, intimidate, threaten or interfere with . . . any person in the exercise or enjoyment of . . . any right granted or protected" under the statute.

96. By the conduct described above, in response to Plaintiff's protected complaints, Defendant subjected Plaintiff to interference, including but not limited to being asked to resign, which constituted a threat to fire Plaintiff to prevent him from exercising his rights under the NYCHRL.

97. As a result of Defendant's conduct, Plaintiff has suffered economic and noneconomic injury for which he is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, through the following relief:

A.    A declaratory judgment that the actions of Defendant complained of herein violate the laws of the State of New York and City of New York;

B.    An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.    An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to emotional pain and suffering and emotional distress;

E.    An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

F.    An award of punitive damages in an amount to be determined at trial;

G.    Prejudgment interest on all amounts due;

H.    Front pay;

I.    An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

J.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 18, 2024
      New York, New York           Respectfully submitted,

                                          **WIGDOR LLP**

By: _____
     Valdi Licul
     William R. Baker

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
wbaker@wigdorlaw.com

*Counsel for Plaintiff*

15