UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                    :

JEFFREY SMITH,               :

                    :

          Plaintiff,       :

                    :

        -v-             :        24 Civ. 4633 (JPC)

                    :

META PLATFORMS, INC.,     :        <u>OPINION AND ORDER</u>

                    :

          Defendant.     :

                    :

------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Jeffrey Smith, a former employee of Defendant Meta Platforms, Inc. ("Meta"), brings this action alleging that his supervisors retaliated against him for complaining about Meta's treatment of female employees by giving him poor reviews and diminishing his responsibilities. Meta now moves to compel arbitration and stay these proceedings under Sections 3 and 4 of the Federal Arbitration Act ("FAA"), arguing that Smith's case must be resolved by an arbitrator according to the Mutual Arbitration Agreement ("MAA") that Smith signed when he began his employment. Smith does not contest that the MAA purports to assign this dispute to an arbitrator, but instead argues that the MAA is invalid and unenforceable under the Enforcing Fairness in Arbitration Act ("EFAA"), which allows parties to avoid arbitration in cases relating to conduct that allegedly constitutes sexual harassment under Federal, Tribal, or State law.

      For reasons that follow, the Court concludes that this case does not involve conduct that is alleged to constitute sexual harassment, so the EFAA does not preclude enforcement of the MAA. Meta's motion to compel arbitration and stay these proceedings is therefore granted.

## I.  Background

### A.    Factual and Procedural History[1]

Smith began working at Meta, which was then known as "Facebook," in July 2018.  Dkt. 22 (Affirmation of Kaitlin McVey) ¶ 2.  At that time, Smith and Meta agreed to the MAA, which requires the parties to "arbitrate before a neutral arbitrator any and all existing or future disputes or claims . . . that arise out of or relate to [Smith's] recruitment, employment or separation from employment with [Meta]."  *Id.*, Exh. A ("MAA") at 1.  Such arbitration would "be conducted in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association," and any decision would "be final and binding on both [parties], subject to review on the grounds set forth in the Federal Arbitration Act."  *Id.* at 2.

Smith's first few years at Facebook were without incident.  Smith worked in management positions in Meta's "AI Platform/PyTorch, FAIR and Reality Labs," where he managed multiple teams of over fifty people.  SAC ¶ 22.  Meta uses a feedback mechanism called a "Pulse report" to evaluate its managers based on feedback from their direct reports, and Smith's Pulse ratings were consistently above average.  *Id.* ¶¶ 24, n.1.  In fact, in each year between 2019 and 2022, Smith received an "Additional Equity Grant" of extra Meta shares, which Meta awards "in recognition of truly exception performance."  *Id.* ¶¶ 27, n.2.  As late as 2022, Meta executives had

---

[1] The facts herein are taken mainly from the allegations in Smith's Second Amended Complaint, Dkt. 28 ("SAC"), which the Court assumes to be true for purposes of this Opinion and Order.  Ordinarily, a court deciding a motion to compel arbitration applies "a standard similar to the one applicable to a motion for summary judgment," and thus "considers all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and draws all reasonable inferences in favor of the non-moving party."  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019).  But for reasons explained below, only Smith's allegations are relevant in determining whether the MAA is not valid and enforceable under the EFAA.  Accordingly, the Court describes the facts as Smith sees them.

indicated interest in promoting Smith to a "higher managerial position." *Id.* ¶ 27.

Smith's trajectory at Meta began to change after Meta reorganized the Augmented Reality Inputs & Interactions Research & Development Team where Smith worked in the summer of 2023. *Id.* ¶ 29. After the reorganization, Smith noticed that a high-performing female employee's role had been inexplicably downsized. *Id.* ¶ 32. A different female employee had also been reassigned to work under a research scientist who, in Smith's view, evaluated her work more critically than the work of male employees. *Id.* ¶¶ 35-36. And other women on Smith's team started complaining to him about their perception of "systemic preferential treatment towards men in promotions and ratings," a "lack of career development support" for women, and "a pattern of neglectful management" from other managers, including "overly critical feedback and bias." *Id.* ¶¶ 40-41. Smith relayed these concerns to Sacha Arnaud, who was a Senior Director of Engineering and Smith's direct supervisor, as well as to Human Resources and several executives at Meta. *Id.* ¶¶ 29, 38, 42. Smith says that his "complaints were clear—he reported to higher-ups at Meta that women were being discriminated against because of their sex." *Id.* ¶ 39.

Looking to fix the problem, Smith took matters into his own hands. But after he gave greater responsibility to the woman whose role had been inexplicably downsized, *id.* ¶ 57, Meta took the "highly unusual" step of not "present[ing] Smith with his planned August formal review," *id.* ¶ 59. Instead, in August 2023, Arnaud informally gave Smith negative feedback, which was the first time Smith had received a negative review while at Meta. *Id.* For the next two months, Smith stopped voicing his concerns, but in October 2023, he "decided that he could not stay silent any longer." *Id.* ¶¶ 61-62. Smith again had discussions about the disparate treatment of certain female employees with Arnaud, Human Resources, and Meta executives. *Id.* ¶¶ 62-64. At the same time, he continued to receive positive Pulse reviews from his direct reports. *Id.* ¶ 65.

The situation continued to escalate.  In December 2023, Arnaud hosted a panel with his "EMG Engineering & Research Leadership team."  *Id.* ¶ 69.  Smith urged Arnaud and his leadership team to "address the question of diversity," which Arnaud evaded, and a few weeks later, Arnaud informed Smith that he would be receiving a negative annual performance review. *Id.* ¶¶ 70-72.  A few months after that, Smith voiced concern about the choice of a "junior white man" to fill a Research Science Manager role because, in Smith's view, "the two most qualified people for the role . . . were both women and were not being considered."  *Id.* ¶¶ 76-79.  Arnaud "question[ed] whether Smith's response was 'productive,'" and shortly thereafter, warned Smith that "taking an already-planned and previously approved trip would cause [him] to miss his performance expectations."  *Id.* ¶¶ 80-81.

Arnaud ultimately gave Smith a "Meets Most Expectations" rating on his annual performance review in March 2024.  *Id.* ¶ 85.  This comparatively low rating resulted in a smaller bonus payout, excluded Smith from consideration for an Additional Equity Grant, and meant that Smith received fewer "equity refreshers," which Meta awards for hitting certain performance goals.  *Id.* ¶¶ 88, n.5.  In addition, as a result of the "Meets Most Expectations" rating, Smith was "automatically placed under observation" by the Employee Relations team at Meta, such that his work came under "intense scrutiny."  *Id.* ¶ 89.

On the same day that he gave Smith a poor annual performance review, Arnaud told Smith to search for a new job within Meta.  *Id.* ¶ 90.  But a month later, in April 2024, Arnaud "made clear that he no longer wanted Smith to remain at Meta, stating that Smith should consider resigning his role.  Smith refused."  *Id.* ¶ 91.

On June 18, 2024, Smith initiated this action by filing a Complaint asserting causes of action for retaliation under New York State Human Rights Law ("NYSHRL") Section 296(7),

retaliation under New York City Human Rights Law ("NYCHRL") Section 8-107(7), and interference with protected rights under NYCHRL Section 8-107(19). Dkt. 1. On June 20, 2024, Smith also filed a charge of retaliation with the United States Equal Employment Opportunity Commission ("EEOC"), which issued a Dismissal and Notice of Right to Sue on July 26, 2024. SAC ¶¶ 8, 94.[2] After taking these actions, Smith claims that his "supervisors engaged in an escalating pattern of behavior intended to force [him] to leave his employment," which included unfairly criticizing the quality of Smith's work, "micro-managing" him, and assigning him work that was typically performed by lower-level employees. *Id.* ¶¶ 95, 97, 99-100, 102. In June 2024, Arnaud reported Smith to the Employee Relations team at Meta for failing to perform his duties, and also criticized Smith for not attending work in-person as often as Meta required, even though many other employees failed to meet this same requirement. *Id.* ¶¶ 100, 103-104.

During this time, Smith began experiencing mental health issues such as stress and anxiety. *Id.* ¶ 108. He unsuccessfully sought a transfer to a different team within Meta, *id.* ¶ 107, and ultimately resigned on July 22, 2024, *id.* ¶ 109.

On August 19, 2024, Meta moved to compel arbitration under Section 4 of the FAA and stay the proceedings in this case under Section 3. Dkt. 9. On August 20, the Court denied Meta's motion without prejudice for failure to comply with the Court's Individual Rules regarding pre-motion letters. Dkt. 13. On September 6, 2024, Smith filed a First Amended Complaint that added a new cause of action for retaliation under Title VII of the Civil Rights Act, *see* 42 U.S.C. § 2000e-3. Dkt. 16.

---

[2] Smith filed an additional charge of retaliation with the EEOC for constructive termination on September 17, 2024, and received a corresponding Dismissal and Notice of Right to Sue on September 19, 2024. SAC ¶¶ 9-10.

On October 3, 2024, Meta filed the instant motion to compel arbitration and stay proceedings under the FAA. Dkt. 20. On October 18, 2024, Smith filed a Second Amended Complaint re-pleading the same causes of action, Dkt. 28,[3] as well as an opposition to Meta's motion, Dkt. 27 ("Opposition"). In opposing Meta's motion, Smith does not challenge that he had agreed to the MAA, or that the MAA, by its terms, requires the dispute at issue to be arbitrated.[4] Instead, Smith argues that the EFAA, 9 U.S.C. § 402, renders the MAA not valid or enforceable because he was retaliated against for complaining about sexual harassment. Opposition at 10. On October 24, 2024, Meta filed a reply in support of its motion. Dkt. 29. Then, on November 27 and December 13, 2024, Dkt. 30, 33, the parties filed supplemental letters regarding *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498 (S.D.N.Y. 2024), a recent decision concerning the EFAA from another judge of this District.

## B.    Statutory Framework

### 1.    The FAA

Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.

---

[3] Although Smith's Second Amended Complaint was filed after Meta had moved to compel arbitration and stay the proceedings, the Court cites to that filing because, as Meta acknowledges, it is "substantively identical" to Meta's First Amended Complaint. Dkt. 29 at 2.

[4] In a single footnote in his opposition to Meta's motion, Smith argues that because "the plain language of his arbitration agreement exempts from arbitration any 'legal dispute or claim that has been expressly excluded from arbitration by statute,'" Meta thus "incorporated into the arbitration agreement [New York] Civil Practice Law and Rules 7515(a)(2), which expressly prohibit[s] 'mandatory arbitration to resolve any allegation or claim of discrimination.'" Opposition at 10 n.7. But as other courts in this District have held, "N.Y. C.P.L.R. § 7515 cannot be invoked to invalidate [an] [a]rbitration [a]greement." *Scott v. AAM Holding Corp.*, No. 23 Civ. 1909 (ALC), 2025 WL 1078302, at *3 (S.D.N.Y. Mar. 19, 2025). "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011).

§ 2.  The FAA thus "embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (cleaned up).  "However, the [FAA's] liberal policy in favor of arbitration is limited by the principle that arbitration is a matter of consent, not coercion.  Specifically, arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (cleaned up); *see Doctor's Assocs.*, 934 F.3d at 250 (explaining that the FAA "intended to place arbitration agreements upon the same footing as other contracts," and arbitration remains "a creature of contract" (cleaned up)).

The enforcement of an arbitration agreement thus hinges on "the scope of the arbitration agreement." *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003). In some cases, however, the parties' contract actually "delegates [that] arbitrability question to an arbitrator." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).  When that occurs, "a court may not override the contract," even if it "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id.*

"Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up).  But "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318-19 (2d Cir. 2021).

When a court determines that an arbitration agreement is enforceable, the FAA provides

two tools for ensuring adherence to that agreement.  First, under Section 3 of the FAA, "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3; *see Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").  Second, under Section 4 of the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  "A party has refused to arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so."  *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 162 (2d Cir. 2021) (cleaned up).

### 2.    The EFAA

"Enacted in 2022, the EFAA is the first major amendment in the history of the FAA." *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 84 (2d Cir. 2024); *see* David Horton, *The Limits of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act*, 132 YALE L.J. FORUM 1, 1 (2022).  It is one of "several federal laws [that were] amended or passed in direct response to the [#MeToo] movement."  *Johnson v. Freborg*, 995 N.W.2d 374, 388 n.5 (Minn. 2023); *see also* 26 U.S.C. § 162(q)(1) (removing tax deductions for "any settlement or payment related to sexual harassment or sexual abuse if such settlement or payment is subject to a nondisclosure agreement"); 42 U.S.C. § 19403(a) (providing, with respect to "a sexual assault

dispute or sexual harassment dispute," that "no nondisclosure clause or nondisparagement clause agreed to before the dispute arises shall be judicially enforceable"). To the extent that legislative history is a reliable indicator, the House Report reflects that Congress intended to ensure that victims of sexual assault and sexual harassment are able to settle their disputes against companies in court rather than in arbitration. *See* H.R. Rep. No. 117-234 at 4 (2022).

In relevant part, the EFAA provides that:

> [A]t the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).[5]

Especially relevant here, the EFAA defines a "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.* § 401(4). But the meaning of "conduct that is alleged to constitute sexual harassment" is itself an open question. Until recently, courts in this District had universally held that if "a plaintiff's basis to invoke the EFAA is that her complaint claims a violation of a Federal, Tribal, or State law against sexual harassment," then "such a claim must be plausibly pled" under the familiar standard set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 585 (S.D.N.Y. 2023); *accord Singh v. Meetup LLC*, 750 F. Supp. 3d 250, 253 (S.D.N.Y. 2024); *Baldwin v. TMPL Lexington LLC*, No. 23 Civ. 9899 (PAE), 2024 WL 3862150, at *6 (S.D.N.Y. Aug. 19, 2024);

---

[5] "The applicability of [the EFAA] to an agreement to arbitrate . . . shall be determined by a court, rather than an arbitrator, irrespective of whether . . . the agreement purports to delegate such determinations to an arbitrator." 9 U.S.C. § 402(b).

*Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 180-82 (S.D.N.Y. 2023); *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 551-52 (S.D.N.Y. 2023).

In *Diaz-Roa*, however, a judge of this District departed from that trend and imposed a lower standard, holding that "a plaintiff need only plead *nonfrivolous* claims relating to . . . sexual harassment" to defeat a motion to compel arbitration under the EFAA. *Diaz-Roa*, 757 F. Supp. 3d at 533 (emphasis added). *Diaz-Roa* explained that this requires a party's allegations of sexual harassment to be at least substantial enough to satisfy the standard from the Supreme Court's decision in *Bell v. Hood*, which held that "a suit may sometimes be dismissed for want of jurisdiction where the alleged claim . . . [(1)] clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . [(2)] is wholly insubstantial and frivolous." 327 U.S. 678, 682-83 (1946); *see Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 70 (1978) (explaining that under *Bell v. Hood*, "the test is whether "the cause of action alleged is *so patently without merit* as to justify the court's dismissal for want of jurisdiction" (cleaned up)).[6]

## II. Discussion

Whether the Court should grant Meta's motion to compel arbitration and stay the proceedings turns entirely on the application of the EFAA. Smith does not dispute that, assuming the MAA is enforceable, the parties' agreement delegates the question of arbitrability to an arbitrator.[7]

---

[6] *Diaz-Roa* also reasoned that potential "false claims of sexual harassment . . . by persons seeking to avoid an otherwise applicable arbitration agreement" would be forestalled by Federal Rule of Civil Procedure 11, which "is a potent weapon against the filing of false or frivolous claims or those made for an 'improper purpose.'" 757 F. Supp. 3d at 541 (quoting Fed. R. Civ. P. 11(b)).

[7] The MAA also incorporates the American Arbitration Association's Employment Arbitration Rules, under which "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Dkt. 23 (Affirmation of Nicholas De Baun), Exh. A at 17. The Second

For reasons given below, the Court ultimately concludes that the EFAA does not bar enforcement of the MAA. The following discussion (1) explains how this Court interprets "conduct that is alleged to constitute sexual harassment," 9 U.S.C. § 401(4); (2) explains why, under that interpretation, this case does not relate to such conduct; and (3) responds to Smith's argument that Meta's motion should be denied under *Diaz-Roa*'s interpretation of the EFAA.

## A.    Legal Standard

When interpreting a statute, a court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). This requires "exhausting all the textual and structural clues bearing on [the text's] meaning and construing each word in its context and in light of the terms surrounding it." *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (cleaned up).

Here, the EFAA defines a "sexual harassment dispute" as "a dispute relating to conduct that is *alleged* to constitute sexual harassment" under applicable law. 9 U.S.C. § 401(4) (emphasis added). In legal parlance, the word "allege" can carry one of two meanings, which are similar, but not quite the same. Sometimes, in a general sense, to "allege" is "[t]o assert as true, . . . though no occasion for definitive proof has yet occurred." *Allege*, BLACK'S LAW DICTIONARY (12th ed. 2024). But other times, we more specifically say that to allege is to assert facts that suffice to show another party has violated some rule—*e.g.*, "[t]he complaint alleged a violation of § 1 of the Sherman Act as well as of the Arizona antitrust statute." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 336 n.1 (1982). Thoughtful observers have long noted that these two uses of the word "allege" are somewhat distinct. *See Brown v. Calamos*, 664 F.3d 123, 128 (7th Cir. 2011)

---

Circuit has held that the language of this rule "explicitly empower[s] an arbitrator to resolve questions of arbitrability." *DDK Hotels*, 6 F.4th at 318.

(Posner, J.) ("*Everything* in a complaint (except the request for relief) is an allegation in the sense that it is an assertion that has not been verified by the litigation process. Yet many of these assertions are not allegations in the sense of charges of misconduct for which the plaintiff is seeking relief.").

Crucially, courts have consistently held that Congress intends to use the second, more specific meaning of "allege" when a statute requires a party to "allege conduct constituting" a legal violation, or some similar textual formulation. In other words, when a statute requires a party to "allege" something in order to introduce evidence, make out a federal cause of action, or avoid arbitration, courts require that party to assert facts that *actually constitute a legal violation*—not just assert their *position or belief* that a legal violation has occurred.

For example, Federal Rule of Evidence 415 allows a court, "[i]n a civil case involving a claim for relief based on a party's *alleged* sexual assault or child molestation, [to] admit evidence that the party committed any other sexual assault or child molestation." Fed. R. Evid. 415(a) (emphasis added). To determine whether a case involves an "alleged sexual assault," the Second Circuit has looked to whether the asserted facts would actually constitute sexual assault—not whether a party seeking to admit evidence merely *claims* that their case involves sexual assault. *See Carroll v. Trump*, 124 F.4th 140, 158 (2d Cir. 2024).

Another example is in the FAA itself. As discussed above, Section 4 of the FAA allows a court to grant a motion to compel arbitration from "[a] party aggrieved by the *alleged* failure, neglect, or refusal of another to arbitrate." 9 U.S.C. § 4 (emphasis added). In applying this provision too, the Second Circuit has looked to whether there is, in fact, a failure, neglect, or refusal to arbitrate—not whether a party *claims* that there is. For example, in *Frazier v. X Corp.*, No. 24-1948, 2025 WL 2502133, at *1 (2d Cir. Sept. 2, 2025), the petitioners argued that by failing to pay

arbitration fees, X Corp. had failed, neglected, or refused to arbitrate under their agreement.  But in the Second Circuit's view, the mere fact that the petitioners were making this argument did not itself suffice to show that there was an "allegation" of a failure, neglect, or refusal to arbitrate. Rather, the Second Circuit looked to the conduct that the petitioners asserted was occurring—*i.e.*, the non-payment of arbitration fees—before concluding that a motion to compel could not be granted because, as a matter of first impression, the non-payment of fees was not a failure, neglect, or refusal under Section 4.  *Id.* at *5-9.

These decisions show that even if the word "alleged" could theoretically be defined broadly to include anything a party "assert[s] as true," *Allege*, BLACK'S LAW DICTIONARY (12th ed. 2024), that is not the interpretation that courts have adopted when a statute uses a phrase such as "conduct that alleges a violation," "a claim that alleges sexual assault," or "conduct that constitutes sexual harassment."  *Cf. Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) ("That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense."); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 787 (2020) (Kavanaugh, J., dissenting) ("[A] phrase may have a more precise or confined meaning than the literal meaning of the individual words in the phrase.").[8]  This consistent interpretive practice is important because

---

[8] There does not appear to be any reason why some statutes use language like the EFAA's "conduct that is alleged to constitute sexual harassment" formulation, *see, e.g.* 42 U.S.C. § 247d-6d(e)(3)(A) (referring to acts or omissions "alleged to constitute willful misconduct"); Fed. R. Bankr. P. 1017(e)(2)(B) (requiring parties to "state with particularity the circumstances alleged to constitute abuse"); 15 U.S.C. § 57b-4(b) (referring to a "conduct or practice which allegedly constitutes a violation of any Federal law with respect to which the Board of Governors of the Federal Reserve System has rulemaking authority"), whereas another statute might just have language like "alleged sexual harassment."  In the Court's view, agonizing over this distinction would attempt to "impos[e] perfection on an imperfect statute."  Abbe R. Gluck, *Imperfect Statutes, Imperfect Courts: Understanding Congress's Plan in the Era of Unorthodox Lawmaking*, 129 HARV. L. REV. 62, 66 (2015).

courts "normally assume that Congress is aware of relevant judicial precedent when it enacts a new statute," *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233-34 (2020), and "[w]here Congress uses terms that have accumulated settled meaning . . . , a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms," *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981).

In light of these principles, the Court concludes that the EFAA applies only if Smith shows that his case relates to conduct that would, if proven, actually amount to sexual harassment under Federal, Tribal, or State law. To be sure, this does not mean that a party invoking the EFAA need necessarily *state a cause of action* for sexual harassment, because to invoke the EFAA, a party's case need only "relat[e] to" sexual harassment. *See Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74 (2d Cir. 2024) (holding that a plaintiff's retaliation claim which asserted that her role was diminished after she *reported* sexual harassment "relat[ed] to" sexual harassment).[9] But regardless of the party's cause of action, there still must be factual allegations sufficiently showing sexual harassment for a party to invoke the EFAA on account of a "sexual harassment dispute."

## B.    Application

To determine whether this case relates to conduct that constitutes sexual harassment under Federal, Tribal, or State law, the Court must determine the meaning of sexual harassment under those sources of law. In so doing, other courts in this District have looked to Title VII of the Civil Rights Act, the NYSHRL, and the NYCHRL.[10]    But looking to these statutes is often

---

[9] The plaintiff in *Olivieri* also alleged that she was sexually assaulted and sexually harassed, but those claims accrued before the EFAA's effective date and thus were not a basis for avoiding arbitration. *See Olivieri*, 112 F.4th at 92 n.10.

[10] The Court agrees with the analysis in *Johnson*, 657 F. Supp. 3d at 552 n.14, as to why the term "State law" in 9 U.S.C. § 401(4) encompasses the law of a state's subdivisions, such as a city.

unilluminating.[11]  Title VII, the NYSHRL, and the NYCHR prohibit discrimination, but they do

not define "sexual harassment" or create a distinct "sexual harassment claim"—sexual harassment

is just one way in which discrimination can occur.  *See Singh*, 750 F. Supp. 3d at 255-56 ("[S]tate

and federal courts have yet to draw a clear line between what constitutes 'sexual harassment' and

what constitutes 'gender discrimination.'  Before the EFAA was passed, such a distinction was

never at issue.").[12]

    These interpretive difficulties are of no moment here, however, because regardless of the

source of law, sexual harassment must be sexual in nature.  *See Sexual Harassment*, BLACK'S LAW

DICTIONARY (12th ed. 2024) (defining "sexual harassment" as "[v]erbal or physical maltreatment,

pestering, or abuse of a sexual nature, including lewd remarks, salacious looks, and unwelcome

touching"); *see also Singh*, 750 F. Supp. 3d at 258 ("[N]ot all gender discrimination is sexual

harassment.").  Indeed, Smith has not pointed to any source of law where this is not the case.  In

opposing Meta's motion to compel arbitration, Smith generally cites federal cases applying federal

law.  Opposition at 6-8.  But a number of federal statutes make clear that, under federal law, sexual

---

[11]  The Court also notes that, in theory, conduct constituting sexual harassment "under applicable Federal, Tribal, or State law" need not be limited to conduct under these three statutes, as opposed to any other statute or regulation.  Here, however, Smith has not pointed to conduct constituting sexual harassment under any applicable law.

[12]  The NYSHRL prohibits "harassment because of an individual's . . . sex," N.Y. Exec. Law § 296, but Smith does not argue—and the Court does not conclude—that harassment on the basis of sex is the same as sexual harassment under the EFAA.  To the contrary, the fact that the EFAA applies to both sexual assault disputes and sexual harassment disputes suggests that Congress had in mind behavior that was sexual—not merely made on *the basis* of sex.  *See Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim noscitur a sociis, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."); *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956) ("The scope of a federal right is, of course, a federal question, [even if] its content is . . . to be determined by state, rather than federal law.").

harassment must be sexual. *See, e.g.*, 38 U.S.C. § 533 ("The term 'sexual harassment' means unsolicited verbal or physical contact of a sexual nature which is threatening in character."); 38 U.S.C. § 1720D(f) (same); 46 U.S.C. § 2101(46) (defining sexual harassment as "unwelcome sexual advances, requests for sexual favors, or deliberate or repeated offensive comments or gestures of a sexual nature"); *see also Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting) ("[T]ypically only the most compelling evidence will persuade this Court that Congress intended nearly identical language in provisions dealing with related subjects to bear different meanings." (cleaned up)).[13]

This requirement is dispositive here because Smith has not alleged any facts describing sexually-charged behavior. Rather, Smith's Second Amended Complaint states that he was retaliated against for reporting "that women were being *discriminated against* because of their sex." SAC ¶ 39 (emphasis added). In particular, Smith says that he complained about the treatment of four female Meta employees. The first employee was a woman whose role was inexplicably downsized after Meta's Augmented Reality Inputs & Interactions Research & Development Team was reorganized. *Id.* ¶ 32. A second employee was a woman who was reassigned to a manager who criticized her work more harshly than the work of male employees. *Id.* ¶¶ 35-37. The third and fourth employees were women who were passed over for a promotion in favor of a "junior white man." *Id.* ¶¶ 76-79.

Although Meta's alleged treatment of these women is regrettable if true, none of these

___
[13] Under the NYSHRL and the NYCHRL, too, sexual harassment must be sexual. *See Singh*, 750 F. Supp. 3d at 256-57 (describing agency guidance suggesting that sexual harassment must be sexual under the NYCHRL); *Johnson*, 657 F. Supp. 3d at 552 ("[T]he NYCHRL's standards of liability are lower than, or equal to, those of the NYSHRL.").

.

allegations relate to mistreatment that was remotely sexual.[14]  In cases where courts in this District have relied on the EFAA to deny motions to compel arbitration in light of allegations of sexual harassment, the alleged conduct was much more obviously sexual in nature.  In *Johnson v. Everyrealm, Inc.*, for example, the plaintiff alleged that her employer's CEO "repeatedly pressured [her] to . . . have sex with colleagues, including herself, or with clients—despite [her] having repeatedly asked [the CEO] to stop."  657 F. Supp. 3d at 554; *see also Diaz-Roa*, 757 F. Supp. 3d at 546 ("The alleged conduct—particularly that it was a term and condition of her employment that Plaintiff become romantically involved with potential clients—is alleged to satisfy, and readily satisfies, at least the New York State and New York City standards for sexual harassment."); *cf. Singh*, 750 F. Supp. 3d at 258 (not finding sexual harassment when a plaintiff alleged that her boss "inappropriately questioned whether [her] pregnancy would impact her commitment to her job").

Ultimately, because the Court concludes that a party invoking the EFAA must actually allege facts that constitute sexual harassment, Smith's non-sexual allegations of gender discrimination at Meta do not suffice to render the MAA unenforceable.

## C.     Smith's Argument

Instead of interpreting the EFAA to require there to be conduct that actually constitutes sexual harassment, Smith argues that the Court should follow *Diaz-Roa* and conclude that a party "need only plead *nonfrivolous* claims relating to . . . sexual harassment."  757 F. Supp. 3d at 533 (emphasis added).  Under that standard, Smith would likely succeed in avoiding arbitration.  After all, even though Smith is incorrect to argue that he has pleaded facts showing there was sexual harassment at Meta, his argument to that effect is not so frivolous as to be sanctionable under

---

[14] Because Smith has not alleged that any sexual harassment occurred at Meta, he has not shown, *a fortiori*, that his dispute here relates to sexual harassment.

Federal Rule of Civil Procedure 11.  Nor is his legal argument "*so patently without merit* as to justify the court's dismissal for want of jurisdiction" under *Bell v. Hood*.  *Duke Power Co.*, 438 U.S. at 70 (cleaned up).

This Court is not persuaded to adopt the standard set forth in *Diaz-Roa*, however.  *Diaz-Roa* provided two primary textual justifications in support of its interpretive conclusion.  First, the court noted that the EFAA does not require a court to determine whether an allegation of sexual harassment "state[s] a claim upon which relief may be granted," as Congress has required in other contexts.  *Diaz-Roa*, 757 F. Supp. 3d at 534; *see, e.g.*, 2 U.S.C. § 1405(b) ("A hearing officer may dismiss any claim . . . that fails to state a claim upon which relief may be granted."); 28 U.S.C. § 1915(e)(2)(B)(ii) (requiring courts to dismiss a complaint filed *in forma pauperis* if it "fails to state a claim on which relief may be granted"); *id.* § 1915A(b)(1) (requiring courts to screen a complaint and dismiss it if it "fails to state a claim upon which relief may be granted").  But as discussed above, that difference is because Congress decided to allow a party to invoke the EFAA even if they pointed to conduct that only "relat[es] to" sexual harassment.[15]

Second, the court in *Diaz-Roa* reasoned that its approach is consistent with the fact that the EFAA's text refers to "conduct that is *alleged* to constitute sexual harassment," as opposed to conduct that *is* sexual harassment.  757 F. Supp. 3d at 534-35.  But another explanation for this textual choice is that Congress opted to require parties to *assert* that a party engaged in conduct that would constitute sexual harassment, rather than *produce evidence* of sexual harassment up

---

[15] In avoiding the language of "pleadings," "complaints," or "stating a claim," Congress also may have been mindful that a party invoking the EFAA need not be a plaintiff in the lawsuit at issue.  For example, it is possible that a party invoking the EFAA has not filed a complaint in federal court but is merely the respondent in an action where the court is being petitioned to compel arbitration under Section 4.

front.  This clarification was important because the other notable exception to the FAA is the "transportation workers" exception, *see Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (2024), and in determining whether that exception applies, courts use "a standard similar to the one applicable to a motion for summary judgment," *Starke*, 913 F.3d at 281 n.1, as opposed to a standard similar to the one applicable to a motion to dismiss.  In light of this backdrop, Congress emphasized that—unlike the transportation workers exception—a party need not prove facts showing sexual harassment to trigger the EFAA.

Diaz-Roa also justified its interpretation in light of the FAA's statutory scheme.  *See* 757 F. Supp. 3d at 537-39.  The court first reasoned that it would be anomalous for the EFAA to require an assessment of the legal sufficiency of a sexual harassment claim because ordinarily, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  Additionally, *Diaz-Roa* noted that because parties have a right to appeal the denial of a motion to compel arbitration, *see* 9 U.S.C. § 16(a), assessing the legal sufficiency of a plaintiff's claim in the context of a motion to compel would, in effect, allow parties seeking to compel arbitration to receive an interlocutory appeal on the merits of a sexual harassment dispute.[16]

---

[16] *Diaz-Roa* also reasoned that applying a standard similar to a pleading requirement in the context of a motion to compel arbitration would be unfair to plaintiffs, because "[w]hile in the ordinary course, a successful Rule 12(b)(6) motion gives rise to an opportunity to replead, no such practice exists when a motion to compel is granted because the complaint fails to meet the Rule 12(b)(6) standard."  757 F. Supp. 3d at 539.  But that presumes that a court would not give the party invoking the EFAA an adequate opportunity to plead sexual harassment.  Indeed, there is no reason a court could not allow a plaintiff to file an amended complaint while a motion to compel is pending.  In fact, that is what happened here—Smith filed his Second Amended Complaint more than two weeks after Meta filed its motion to compel arbitration and stay the proceedings.  *See* Dkts. 20, 28.

But requiring the assertion of facts that relate to conduct that actually amounts to sexual harassment is consistent with the FAA's design.  At the motion to compel arbitration stage, courts are often tasked with deciding "gateway dispute[s]," *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002), about issues such as "the formation of the parties' arbitration agreement," *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-300 (2010), or which agreement controls "if parties have multiple agreements that conflict," *Coinbase, Inc. v. Suski*, 602 U.S.143, 149 (2024).  These questions tend to be intertwined with the merits, and yet, when a court denies a motion to compel on these bases, the FAA allows a party to immediately appeal that decision. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) ("Congress provided for immediate interlocutory appeals of orders *denying*—but not of orders *granting*—motions to compel arbitration.").  So too here.[17]

Moreover, with regard to statutory structure, this Court believes that the standard it adopts is the standard most consistent with the FAA's "liberal policy in favor of arbitration." *Holick*, 802 F.3d at 395.  While the FAA's solicitude for arbitration has its limits, it is fair to assume that Congress did not lightly upend a statute that has remained unchanged for 100 years.  It is therefore likely that the EFAA devotes federal-court resources to otherwise arbitrable cases only when those cases *actually* involve cognizable allegations of sexual harassment. *Cf. Diaz-Roa*, 757 F. Supp.

---

[17] *Diaz-Roa* also briefly reasoned that requiring a party to assert facts that actually constitute sexual harassment would be "inconsistent with . . . Second Circuit precedent" after *Olivieri*, where the plaintiff stated a claim only for retaliation. *Diaz-Roa*, 757 F. Supp. 3d at 536. But *Oliveri* held that a claim for retaliation *for reporting sexual harassment* related to sexual harassment.  112 F.4th at 92 ("This Court has recognized that retaliation for reporting discrimination is reasonably related to the underlying discrimination, such that a plaintiff who exhausts a discrimination claim with the EEOC may also pursue a claim for retaliation." (internal quotation marks omitted)).  It does not follow from this conclusion that an assertion of facts establishing conduct relating to sexual harassment is not required under the EFAA.

3d at 535 n.10 (noting that the EFAA was amended to "embrac[e] sexual harassment jurisprudence" (quoting 168 Cong. Rec. H991 (daily ed. Feb. 7, 2022) (statement of Rep. David Scott)).

* * *

Because the Court concludes that Smith's case does not relate to conduct constituting sexual harassment, the EFAA does not bar enforcement of the MAA. There is no dispute that Smith and Meta entered into an agreement to arbitrate through the MAA. And the MAA, in turn, delegates the question of arbitrability to an FAA arbitrator. The Court now "must respect the parties' decision as embodied in [that] contract." *Henry Schein*, 586 U.S. at 65. The Court also grants Meta's request to stay this proceeding pending arbitration. *See Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) (holding that under Section 3 of the FAA, 9 U.S.C. § 3, "a stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested").

### III. Conclusion

For the foregoing reasons, the Court grants Meta's motion to compel arbitration and stay these proceedings. The Clerk of Court is respectfully directed to stay the proceedings and close the motion at Docket Number 20.

SO ORDERED.

Dated: September 30, 2025
New York, New York

_____
JOHN P. CRONAN
United States District Judge